UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANTHONY ALLEGRINO,                      :
                                        :
        Plaintiff,                      :
                                        :
v.                                      :       CASE NO. 3:14cv1865(VAB)
                                        :
STEVEN SACHETTI,                        :
                                        :
        Defendant.                      :

RULING ON MOTION FOR PREJUDGMENT REMEDY

Pro se plaintiff, Anthony Allegrino, commenced this action

against Steven Sachetti, alleging replevin, conversion, and

negligent infliction of emotional distress.[1] (Doc. #1.)  Pending

before the court is plaintiff's motion for prejudgment remedy.

He seeks an order of replevin of certain personal property he

claims defendant is wrongfully detaining.[2] (Doc. #2.)  The court

held a hearing on January 7, 2015, at which both parties

testified and presented evidence.  For the reasons set forth

below, the motion is DENIED.

---

[1]Although plaintiff claims conversion and negligent
infliction of emotional distress, "in a replevin action, no
cause of action may be stated other than replevin."  Leasing
Technologies Int'l, Inc. v. Uniscribe Prof'l Servs., Inc., No.
CV010181875S, 2002 WL 1949198, at *1 (Conn. Super. Ct. July 23,
2002); see also Conn. Gen. Stat. § 52-522.  Defendant moved to
dismiss the complaint on this and other grounds. (Doc. #16.)
That motion is currently pending.

[2]On December 23, 2014, District Judge Alvin W. Thompson
referred the motion to the undersigned. (Doc. #12.)  District
Judge Victor A. Bolden has been reassigned as the presiding
judge. (Doc. #24.)

I.    Background

Before setting forth its factual findings, the court

provides a brief background.[3]  This case revolves around what

otherwise might be considered an ordinary wooden shipping crate,

if not for plaintiff's contention that the crate and its

contents are significant in authenticating a 1948 Jackson

Pollock painting entitled "Gemini," worth an estimated $80 to

150 million. (Doc. #1, ¶¶ 15, 16.)  According to plaintiff, in

1953, Ethan Thompson, the husband of plaintiff's friend, Dazel

Thompson,[4] purchased the painting from the Gimpel Fils gallery in

London, which delivered it to him in the shipping crate now at

issue. (Tr. 66; doc. #2-1, p. 6; doc. #2-2, ¶ 21.)  Plaintiff, a

former attorney and now self-employed art dealer, testified that

he owns the original "Gemini" painting (Tr. 8, 92) and has been

consulting with art experts since 2011 about its authenticity

and potential value. (Tr. 7; doc. #2-2, ¶ 8.)  Plaintiff

believes that the shipping crate contains an exhibition poster

promoting the painting, and that the poster might be "the only

---

[3]The background information was provided by plaintiff during
testimony and in various submissions.  The court makes no
factual findings here.  This background is only to place the
motion in context.

[4]Plaintiff explained that he met Dazel Thompson through her
daughter.  During his "travels as a lawyer in Florida," he
"bumped into" Dazel's daughter, who later introduced plaintiff
to her mother at a nursing home in Vermont where she resided.
(Tr. 38-39.)

verifiable provenance for this same Jackson Pollock painting."
(Doc. #2-2, ¶¶ 10, 15; Tr. 83-84, 86.)

In 1953, for reasons that are unclear, the shipping crate and its contents were placed as a "memorial" on land located at 48 Dayton Road in Redding, Connecticut. (Tr. 20, 32, 63; doc. #2-2, ¶¶ 25, 26.)  At the time, that property was owned by Harvey Root, Ethan Thompson's relative. (Tr. 20, 32, 63; doc. #2-2, ¶¶ 25, 26.)  Defendant now owns the land.[5] (Tr. 20, 32, 63; doc. #2-2, ¶¶ 25, 26.)  Plaintiff testified that in February 2002, Dazel Thompson gave him the legal right to remove and take possession of this shipping crate memorial.  (Tr. 62-63; doc. #1, ¶¶ 8, 9; doc. #1-1, p. 12; doc. #2-1, p. 1, doc. #2-2, ¶ 3.) Although plaintiff stated that he has been "working on this project for a long time," he did not contact defendant about the shipping crate until November 2014. (Tr. 92.)

II.  Factual Findings

The parties have very different versions of the events giving rise to the pending motion for prejudgment remedy.  The court recounts each version, as told at the evidentiary hearing on January 7, 2015, before setting forth its factual findings.

---

[5]At the hearing, defendant stipulated that legal title to 48 Dayton Road transferred from Harvey Root to the Bank of Darien and then to defendant, who has owned the property since 1991. (Tr. 22-23.)

A. <u>Plaintiff's Testimony</u>

Plaintiff testified that on November 23, 2014, prior to any contact with defendant, he went to 52 Dayton Road, the address bordering defendant's property.  (Tr. 21.)  The house appeared vacant, so he decided to walk around. (Tr. 21-22.)  From the back fence line, plaintiff took a photograph of what he believed to be the shipping crate.  (Tr. 25; Pl. Exs. 2, 3.)  The crate was on defendant's property, about fifty feet away. (Tr. 25.) This photograph, as well as a version showing a zoomed-in portion, were introduced into evidence. (Pl. Exs. 2, 3.)

At the hearing, while looking at the zoomed-in version (Pl. Ex. 3), plaintiff testified that the shipping crate is plainly visible in the photograph, as is writing on the side of it:

> [PLAINTIFF]:  And the name of the painting is Gemini, Judge.  You can see the "M" very clear and the "8A" above the "M." The rest of that says "Gemini."  On the right side of the photograph, there's a wooden crate . . . .
> THE COURT:    Why don't you show me where you're indicating.
> [PLAINTIFF]:  Right here there's a black writing. There's the "M," and here's the "A" and the "8."  It's this way.  It's upright.  See, it's upright on the right here.  This is a black -- there's the "M" in the black writing.  There's a "G." Here's the "8" and the "A."

(Tr. 30-31.)

Later on November 23, 2014, the parties met for the first time at defendant's business, a garden center in Wilton, Connecticut.  (Tr. 115.)  Plaintiff asked defendant for

4

permission to retrieve the shipping crate from his property. (Tr. 55, 56, 114-18.)  Defendant refused. (Tr. 55, 56, 114-18.)

Plaintiff filed this lawsuit and the pending motion for prejudgment remedy on December 12, 2014. (Doc. #1, 2). Defendant was served with a copy of the complaint and the motion on December 17, 2014. (Doc. 10.)  Thereafter, the parties exchanged several emails. (Doc. #11.)  Defendant agreed to allow plaintiff onto his land to look for the shipping crate. (Doc. #11.)  They planned to meet on Saturday, December 21, 2014. (Tr. 70, 119.)

On December 21, 2014, plaintiff sent defendant a text message saying that he was lost and would be late. (Tr. 70, 74.) He brought with him as a witness his girlfriend's uncle, Vincent Cracolici. (Tr. 43.)  When they arrived, Redding police officer Sergeant Quinn was present. (Tr. 82.)  Sergeant Quinn forced Cracolici to wait in the car. (Tr. 82.)  He then asked plaintiff for his license and refused to give it back. (Tr. 45, 49.) Plaintiff told Sergeant Quinn why he was there, but Sergeant Quinn, accompanied by the defendant and another man, proceeded to harass, intimidate, and shove him,[6] all while using profanity. (Tr. 43, 45-47.)

_____

[6]Plaintiff testified that he felt threatened and was concerned that defendant and Sergeant Quinn were going to beat him up (Tr. 45-47, 49, 50, 78, 90), but clarified that "nobody touched [him]." (Tr. 72.)  Rather, he felt that Sergeant Quinn,

Plaintiff testified that he was "forced to sign" an agreement defendant had prepared.  It stated that after completing his search, plaintiff would withdraw his complaint. (Tr. 43, 45-47.)  Before signing the document, plaintiff inserted the word "if" to clarify that he agreed to withdraw his complaint only if he found the shipping crate and took it with him. (Tr. 81-82.)

Plaintiff told defendant where he thought the shipping crate was located[7] and said he wanted to walk to the left side of the property to find it. (Tr. 34, 48-49.)  Defendant "prevented" him from going that way, leading him to the right instead, insisting that plaintiff "needed to follow him."  (Tr. 48, 74, 77-78.)  Plaintiff followed defendant's lead because he "didn't know what was going to happen." (Tr. 49.)  Defendant led plaintiff to the back of his property, and when plaintiff could not find the shipping crate, defendant said, "You see it's not here.  I have to go.  Let's leave." (Tr. 49.)  They walked back to their cars and plaintiff left. (Tr. 49.)  He was only allowed

---

"through his actions and his words . . . was making it seem like [plaintiff] was there for some criminal purpose." (Tr. 72.)

[7]Plaintiff obtained a tax map from the Fairfield county records department, which he introduced into evidence. (Tr. 15-16; Pl. Ex. 1.)  At the hearing, plaintiff identified on the map the area of defendant's property where he believes the shipping crate was located when he photographed it. (Tr. 18, 113-14, 184; Pl. Ex. 1.)

to look for the shipping crate for about five to ten minutes. (Tr. 47, 49, 74, 91; Pl. Ex. 5.)

### B. Defendant's Testimony

The defendant's version varies greatly.  First, he rejects the assertion that the photograph depicts his property, especially on November 23, 2014. (Tr. 113, 188.)  He described the photograph as just "another woodland scene" of ferns, green foliage, and an overturned tree. (Tr. 114; Pl. Exs. 2, 3.) Defendant is a professional landscaper and is familiar with "every inch" of his eleven acre parcel.  Since purchasing the property in 1991, he has landscaped and manicured all of it. (Tr. 111, 113, 157.)  He walks his property every week and is "definitely sure" the shipping crate is not there. (Tr. 112, 154.)  He stated, however, that were he to find the crate at any time in the future, he "absolutely" would return it to plaintiff. (Tr. 154.)  He testified that there are no ferns or overturned trees in the area plaintiff allegedly photographed. (Tr. 113-14.)  Moreover, by November when plaintiff said he took the photograph, most of the leaves already had fallen off the trees in Redding. (Tr. 113, 114.)

Defendant did not want to be alone with plaintiff at their December 21, 2014 meeting, so he requested the presence of a Redding police officer "as a witness and to supervise this access onto [his] property."  (Tr. 120-21.)  He also asked his

7

friend, Gene Nazzaro, to accompany him. (Tr. 121.)  The Redding police department sent Sergeant Quinn to the property. (Tr. 126-27.)

Plaintiff sent defendant a text message saying that he was running an hour late.  (Tr. 121.)  Plaintiff arrived with another man. (Tr. 124.)  Defendant explained the purpose of the meeting to Sergeant Quinn. (Tr. 127-28.)  Sergeant Quinn asked plaintiff for his license. (Tr. 127.)  Defendant handed plaintiff a proposed agreement he had drafted which stated that plaintiff could inspect his property and take the shipping crate if he found it, but that the inspection was conditioned on plaintiff's withdrawal of the complaint. (Tr. 128-29; Pl. Ex. 5.)  Before reading the document, plaintiff began writing on it. (Tr. 171.)  Plaintiff explained to defendant that he wanted to make sure he could take the crate with him if he found it. (Tr. 171.)  Defendant responded that if plaintiff read the document, he would see that it already contained such a provision. (Tr. 171.)  Plaintiff read the agreement. (Tr. 172.) Both parties signed it and Sergeant Quinn signed as a witness. (Tr. 130.)

Plaintiff described where he believed the shipping crate was located and stated that he wanted to walk to the left of defendant's property to reach it.  Defendant explained that it would be physically impossible to walk in that direction because a forty-foot ledge obstructed the route. (Tr. 135.)  Instead, he

8

directed plaintiff to the right, which was the "easiest, fastest, quickest, direct way" to get there. (Tr. 136.) Defendant described that they "went up the driveway . . . to the right . . . through [the] vegetable garden, behind [the] house, down . . . behind the paddock, down to the access road, [and] walked all the way up the access road to where [plaintiff] wanted to go."  (Tr. 165.)  This took about five to six minutes. (Tr. 140.)

When they arrived at that location, plaintiff was unable to find the shipping crate. (Tr. 136.)  He pointed to another area he wanted to search. (Tr. 136.)  Defendant advised that it was not part of his property, so he could not give plaintiff permission to walk through it. (Tr. 136.)  The entire meeting lasted for over an hour, from about 2:20 to 3:30 PM. (Tr. 140.)

C. The Court's Findings

The court listened carefully to the testimony, reviewed the exhibits, observed the demeanor of the witnesses, and reflected carefully on all of the evidence.  For the most part, the court credits defendant's testimony and does not credit plaintiff's testimony.[8]  The court finds as follows.

---

[8]In making its factual findings, the court takes into consideration plaintiff's admission on cross-examination that he has been disbarred by the state of California.  Plaintiff testified that he was disbarred because of "a billing dispute with some Albanian clients that snuck into the country." (Tr. 58.)  He maintains, however, that the decision is "not valid" or

The central piece of evidence is the photograph taken by plaintiff which ostensibly depicts the shipping crate on defendant's land.  The court need not settle the parties' dispute about whether the photograph shows defendant's property on November 23, 2014.  Regardless of when and where the photograph was taken, no strain of the eyes reveals a shipping crate, much less one bearing the writing that plaintiff described with such specificity.  Thus, there is no physical evidence of the shipping crate on defendant's property.  The only evidence of the crate's existence on defendant's property is plaintiff's own testimony.  At no time has defendant seen anything resembling the shipping crate on his property, but were he to ever find it, he would return it to plaintiff.

---

final and that there is a "political dispute between [plaintiff] and the Chief Judge, Ronald George, of the California Supreme Court." (Tr. 57-60.)

   This testimony bears directly on the court's assessment of plaintiff's credibility and character for truthfulness.  See, e.g., United States v. Vasquez, 840 F. Supp. 2d 564, 574 (E.D.N.Y. 2011) ("Rule 608(b) of the Federal Rules of Evidence vests the district courts with discretion to permit cross-examination into specific instances of conduct if the conduct is probative of [that witness's character for] truthfulness or untruthfulness. . . .  Under this rule, the Second Circuit has upheld cross-examination into an attorney's disbarment.") (citation omitted; internal quotation marks omitted); see also United States v. Weichert, 783 F.2d 23, 26 (2d Cir. 1986) ("Inquiry into disbarment to impeach credibility generally has been allowed."); United States v. Rubenstein, 151 F.2d 915, 919 (2d Cir. 1945) (holding that "[i]t was plainly proper to impeach [witness]'s credibility on cross-examination by asking him whether he had ever been disbarred or suspended.").  Nonetheless, even without evidence of his disbarment, the court would not credit plaintiff's version of the events.

The parties first met at defendant's garden center on November 23, 2014.  Plaintiff asked defendant for permission to retrieve the shipping crate from his property, but defendant refused.  Less than three weeks later, on December 12, 2014, plaintiff filed this complaint and motion for prejudgment remedy. (Doc. #1, 2.)  The parties subsequently exchanged emails and defendant agreed to allow plaintiff an opportunity to look for the shipping crate.  They planned to meet on December 21, 2014.

On December 21, 2014, defendant and his friend Nazzaro arrived at defendant's home for this meeting.  Plaintiff had sent a text message to defendant saying he would be about an hour late.  At defendant's request, the Redding police department sent Sergeant Quinn to oversee the meeting.  Sergeant Quinn was present when plaintiff arrived with his friend Cracolici.  The parties explained the purpose of the meeting to Sergeant Quinn, who asked plaintiff for his license.

Defendant presented plaintiff with a document entitled "Access Agreement and Agreement to Withdraw Federal Case" that he had drafted before the meeting.  It said:

> I, Steve Sachetti, will agree to allow you access, with me accompanying you, to my property at 48 Dayton Road, Redding, CT for purposes of locating the property that you say is in "plain view" on my property and which you claim is yours.  If your property is there, you may take it with you.  If it is not there, the inspection is over and you agree to

11

> promptly leave my property.   I am allowing such
> inspection on the condition that you withdraw the
> lawsuit that you have commenced in the Hartford
> Federal Court.

(Pl. Ex. 5.)  Before reading the agreement, plaintiff wrote the word "if" on it.  Both parties signed the agreement and Sergeant Quinn signed as a witness.  At no time did anyone harass, intimidate, threaten, or coerce plaintiff into signing the document.

Plaintiff told defendant where he thought the shipping crate was located and said he wanted to walk to the left to find it.  Defendant, however, directed him to the right because a steep ledge on the property made it physically impossible for them to walk plaintiff's suggested route.  Defendant led the way.  The walk took about five minutes.  When they arrived at the specified location, plaintiff could not find the shipping crate.  No one prevented plaintiff from searching for the crate. Plaintiff told defendant that he wanted to look in another area on neighboring property.  Because defendant did not own that land, he did not authorize plaintiff's access to it.  They walked back to their cars and plaintiff and Cracolici left.  The entire interaction lasted about an hour.

III. <u>Legal Standard</u>

Plaintiff seeks a prejudgment remedy in the form of an order of replevin pursuant to Connecticut General Statutes § 52-

278a et seq.  The state prejudgment remedy statute defines prejudgment remedy as "any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of his property prior to final judgment . . . ." Conn. Gen. Stat. § 52-278a(d).  "Prejudgment replevin is among the prejudgment remedies authorized pursuant to § 52-278a et seq." Culligan v. James Erskine & Co., No. CV 91-0323816, 1991 WL 273773, at *3 (Conn. Super. Ct. Dec. 11, 1991).  Replevin "exists to achieve the return to the rightful owner of goods wrongfully taken or detained by another."  Id.

State prejudgment remedies are available in federal court by way of Federal Rule 64.  See Fed.R.Civ.P. 64(a) ("[E]very remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.").  The role of the court in considering an award of a prejudgment remedy is well established.  The prejudgment remedy will be granted only after a determination that there is "probable cause that a judgment . . . will be rendered in the matter in favor of the plaintiff." Conn. Gen. Stat. § 52-278d(a).

"Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair

13

preponderance of the evidence." Hyde v. Beverly Hills Suites, LLC, 265 F.R.D. 61, 63 (D. Conn. 2010) (internal quotation marks omitted). Probable cause is "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Three S. Dev. Co. v. Santore, 193 Conn. 174, 175 (1984) (internal quotation marks omitted). The "court must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the burden of showing probable cause to sustain the validity of his claim." Shankman v. Schmugler, No. CV990080926S, 2000 WL 775595, at *1 (Conn. Super. Jun. 2, 2000) (citations and internal quotation marks omitted).

An "action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention." Conn. Gen. Stat. § 52-515. Thus, plaintiff here must establish that the shipping crate and its contents (1) constitute goods or chattels; in which he has (2) a property interest; and (3) a right to immediate possession; and that (4) defendant has wrongfully detained them.

IV.   Analysis

Even keeping in mind the relatively low standard of probable cause, the court finds that plaintiff has failed to show that he will succeed on the merits of his replevin action. Plaintiff cannot satisfy even the first requirement of his replevin action because he has not shown that the property he seeks to replevy constitutes goods or chattels within the meaning of § 52-515.  In order to prove that the property constitutes goods or chattels, the "property must exist in specie so as to be capable of identification." Kosminoff v. Norwalk Fast Oil, No, CV 95-0145751, 1995 WL 459266, at *2 (Conn. Super. Ct. July 26, 1995) (internal quotation marks omitted).  The evidence here does not support such a finding. Specifically, the photograph purporting to show the shipping crate on defendant's property does not depict anything resembling it; the defendant (who has no interest in or claim to the shipping crate) has never seen the crate; and when given an opportunity to search for it, plaintiff could not find it.  The only evidence of the shipping crate on defendant's property is plaintiff's testimony insisting it is there.  For reasons already discussed, the court does not credit that testimony.

In the absence of factual support for the existence of the shipping crate, plaintiff has failed to show probable cause that he will succeed in his replevin action.  See, e.g., Culligan v.

15

James Erskine & Co., No. CV 91-0323816, 1991 WL 273773, at *3 (Conn. Super. Ct. Dec. 11, 1991) (denying application for prejudgment replevin "for failure to identify the existence of property to which the plaintiff can establish probable cause as to a right to possession and wrongful detention by the defendant"); see also Fox Rothschild, LLP v. O'Halpin, No. FSTCV125013803S, 2012 WL 2855807, at *13 (Conn. Super. Ct. June 12, 2012) (denying application for prejudgment remedy, finding that "even that low standard [of probable cause] was not satisfied by the evidence presented to the court by the plaintiff"); Aetna Life Ins. Co. v. Pawloski, No. HHBCV064009831S, 2006 WL 1921836, at *3 (Conn. Super. Ct. June 9, 2006) ("[A] a court cannot base a finding of probable cause on opinion, surmise or speculation, in the absence of factual support.").

Assuming arguendo that plaintiff had shown the shipping crate's existence, he likely could have established the second and third elements of his replevin action, i.e., his property interest in and his right to immediate possession of the crate. Defendant does not contest these elements. But, even if plaintiff had been able to satisfy these first three elements, his motion for prejudgment remedy nonetheless would fail because he did not establish the final element of his replevin action: that defendant wrongfully detained the shipping crate.

16

The Connecticut replevin statute instructs that "[i]f the taking of the goods is not complained of, but the action is founded upon their wrongful detention, the complaint shall set forth the facts showing that the detention was wrongful." Conn. Gen. Stat. § 52-523. There is no evidence here that defendant wrongfully detained the shipping crate. Defendant has not seen anything resembling the shipping crate on his property and testified that were he to find the shipping crate at any time in the future, he would return it to plaintiff. (Tr. 151, 154.) The court thus concludes that even if plaintiff had established (1) the shipping crate's existence; (2) his property interest in the crate, and (3) his right to its immediate possession, he nonetheless would have failed to show, even by the relatively low standard of probable cause, that (4) defendant wrongfully detained it.

## V.   Conclusion

Because plaintiff has failed to satisfy his burden to establish probable cause as to the validity of his claim, his motion for prejudgment remedy is DENIED.

SO ORDERED at Hartford, Connecticut this 3rd day of March, 2015.

```
_____/s/_____
Donna F. Martinez
United States Magistrate Judge
```